Estate of Francis J. McGovern, Petitioner *v.* Commonwealth of Pennsylvania, State Employes' Retirement Board, Respondent.

Argued June 6, 1984, before Judges WILLIAMS, JR., BARRY and BLATT, sitting as a panel of three.

*Richard P. Hunter, Jr., Ominsky, Joseph & Welsh, P.C.*, for petitioner.

*Marsha V. Mills*, Assistant Chief Counsel, for respondent.

OPINION BY JUDGE BARRY, September 5, 1984:

This is an appeal from a decision dated March 24, 1982, of the Pennsylvania State Employes' Retirement Board (Board). On December 17, 1980, Francis J. McGovern, who had been employed by the Delaware Joint Toll Bridge Commission since August 6, 1951, selected his wife, Mrs. Loretta McGovern, as beneficiary of his retirement benefits. He chose a joint survivor annuity and signed the appropriate certification to that effect. Petitioner, Michael McGovern, the son of Francis J. McGovern, contended, before the Board, that his father did not have the requisite mental capacity to execute the retirement application on December 17, 1980. The Board rejected this contention and accepted a recommendation dated March 11, 1982, of Raymond Kleiman, Esquire, hearing examiner, denying a request to change or void the annuity contract. The Board found, as a fact[1] that "under the

---

[1] Finding of Fact No. 20.

Options 4 and 3, as chosen by Mr. McGovern, his Estate was due the sum of $27,105 as a lump sum payment, under Option 4, and $499.92 as that portion of the monthly annuity benefit due from January 9 to January 28, 1981, under Option 3.''[2] The Board's conclusion of law No. 1 was that ''Mr. Francis J. McGovern did not lack the requisites or mental capacity to execute his retirement application on December 17, 1980 and did understand the nature of the transaction.'' If Mr. McGovern had selected a living beneficiary or had not selected any beneficiary at all, the sum of $154,311.45 would have been available to the living beneficiary or his estate. (R. 29a)

Our scope of review where the decision of the Board is against the appellant-claimant is to determine whether the Board's findings of fact are consistent with each other and with its conclusions of law, and can be sustained without a capricious disregard of the evidence. *Brayo v. Workmen's Compensation Appeal Board,* 62 Pa. Commonwealth Ct. 234, 435 A.2d 1346 (1981).

Michael J. McGovern, the decedent's son, an attorney and the executor of his estate, testified that his father had a history of alcoholism for about twenty years. With the help of his family doctor the condition was stablized so that he was functional and did not miss work. In October, 1979, it was discovered that decedent's wife had Hodgkins Disease. In March of 1980, Dr. Rubin, informed her that she was in the late stages of the disease. At about this time, the decedent, who had been almost exclusively a beer drinker, switched from beer to whiskey and his condition deteriorated rapidly. (R. 32a) He missed work frequently and was sent home because he was drunk on the job.

[2] For the options available to members of the fund see 71 Pa. C. S. §5705.

(R. 33a) Neighbors called that he had fallen down and bartenders called that he would not leave the bar. (R. 33a) Decedent seemed, at times, to accept his wife's illness but at other times he claimed she was a hypochrondriac, she was faking, she was fine, maybe she had an ulcer. (R. 34a) In September or October of 1980, at the urging of his son, the decedent made a will in which he named his daughter, Loretta, the youngest of his four children and the only one living at home, as his heir. On several occasions, when his son had arranged to pick him up and take him to the Board to sign pension papers, the decedent was "blind drunk" (R. 41a) The decedent told James C. Kendig, Assistant Personnel Manager of the Delaware River Port Authority, who handled pension matters for that body, that he had a lawyer in the family who would accompany him to discuss his options for retirement. (R. 42a) Around Thanksgiving of 1980, the condition of the decedent further deteriorated. He abused his wife and yelled at her, called her a faker and accused her of trying to make him feel guilty. Mrs. McGovern began to contemplate committing the decedent to an institution. (R. 43a) She abandoned these plans because the holiday season approached and hoped that his condition would improve. The decedent was in terrible shape, emaciated, surviving only on peanut butter, cream cheese and crackers and beer and whiskey; he was very high strung. (R. 45a) Because of the condition of his mother, Michael McGovern had completely forgotten about his father's pension plan. (R. 46a) Francis McGovern informed his son that he intended to name his daughter, Loretta, as his beneficiary under Option 1 of the Board. The decedent never informed his son, during his lifetime, that he had, in fact, exercised a different option. (R. 48a) As Mrs. McGovern's condition deteriorated, the decedent

drank almost non-stop, did not sleep and hallucinated about seeing his dead father on the street. (R. 49a) He would dress for work even though he had retired. (R. 50a) Mrs. McGovern died on January 23, 1981. She had been in the hospital fifty or sixty days during a year period and yet the decedent had visited her only five minutes in that period. (R. 51a) When told of his wife's death, the decedent called his son a liar and insisted on talking to the doctor personally. (R. 52a) Although he had been drinking continuously day in and day out when his wife died he suddenly stopped drinking altogether, stopped smoking, although he had been a three-pack a day smoker, stopped eating and did not sleep. (R. 52a) He continued to hallucinate and talk to his father. (R. 53a) On January 28, 1981, after the McGovern family had returned from Mrs. McGovern's wake, they heard a thud upstairs and found Mr. McGovern dead. (R. 54a)

James R. Moore, who had known the decedent twenty-eight years and had worked with him for sixteen years, corroborated the change in the decedent's drinking habits after his wife became ill. (R. 89a) He testified that Mr. McGovern told him that he wanted everything to go to his daughter, Loretta. (R. 91a) The decedent said that he intended to bring his son to the office of Mr. Kendig, because his son was a lawyer. (R. 94a) He called the witness and asked him to pick up and take him to work, despite the fact that he had already retired. (R. 82a) He insisted that the only thing wrong with his wife was that she had bleeding ulcers. (R. 99a) The decedent called him after he had signed the retirement papers and told him he had taken Options 1 and 4. (R. 103a) He said his daughter would receive everything. (R. 104a)

Charles E. Sears, a patrolman for the Delaware Port Authority, testified regarding the decedent's

nervous condition, his emotional state, and excessive drinking. (R. 108a) He lost time from work. (R. 109a) Mr. McGovern would not admit that his wife had cancer and would change the subject when someone inquired about his wife's physical condition. (R. 110a) He said he planned to take care of his daughter. (R. 111a)

James C. Kendig had discussed retirement with Mr. McGovern on several occasions before his death. He testified, for the Board, that he explained to Mr. McGovern the various retirement options available to him. (R. 120a) In August or September of 1980, the decedent had indicated that in all likelihood he would designate his wife as his beneficiary. (R. 124a) He appeared alert according to the witness and to understand the discussion about retirement. (R. 126a) On December 17, 1981, the witness saw the decedent alone in his office. The decedent chose option 3 and designated his wife as his beneficiary. (R. 129a) In response to a question about his wife's health he gave a vague answer. (R. 131a) At no time did the decedent ask any questions concerning the designation of somebody other than his wife as a beneficiary. (R. 137a) The witness had "heard a rumor that he was drinking". (R. 163a) On the day of the last interview, decedent smelled of rose water. In fact, the witness said, "it seemed to be an overpowering smell." (R. 173a) He would not comment on whether the smell was being used to "mask his alcohol". (R. 173a) Mr. Kendig admitted that the selection of option 3 was unusual under the circumstances.

The Court has gone extensively into the facts of this case because the question of whether the decedent was mentally competent at the time he exercised his option is essentially a factual one. It is to be noted that neither the examiner nor the Board made findings

that they did not believe any part of petitioner's testimony which the Court has attempted to summarize accurately.

The Board cites *Taylor v. Avi*, 272 Pa. Superior Ct. 291, 415 A.2d 894 (1980), for the proposition that, under Pennsylvania law it is presumed that an adult is competent to execute an instrument and thus a signed document yields the presumption that it accurately expresses the state of mind of the signing party. The burden of overcoming this presumption is a heavy one and must be met by evidence that is clear, precise and indubitable. The evidence must be of such weight and directness as to make out the facts alleged beyond a reasonable doubt. Mere weakness of intellect resulting from sickness is not enough to set aside an executed contract if sufficient intelligence remains to comprehend the nature and character of the transaction, and no evidence of fraud, mutual mistake or undue influence is present.

The appellant cites The Restatement of the Law of Contracts Second, Chapter 1, §15, and contends the Estate has proved mental illness within the meaning of the Restatement. We agree with the appellant in this case, although the Board cannot be faulted for invoking the sanctity of a contract and being unwilling to change the terms of a written instrument.

Section 15 of the Restatement Second, states as follows:

15. Mental Illness or Defect

(1) A person incurs only voidable contractual duties by entering into a transaction if by reason of mental illness or defect

(a) he is unable to understand in a reasonable manner the nature and consequences of the transaction, or

(b) he is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition.

(2) Where the contract is made on fair terms and the other party is without knowledge of the mental illness or defect, the power of avoidance under Subsection (1) terminates to the extent that the contract has been so performed in whole or in part or the circumstances have so changed that avoidance would be unjust. In such a case a court may grant relief as justice requires.

We believe that the following comment on this Section of the Restatement is especially applicable to this case:

Comment:

a. *Rationale.* A contract made by a person who is mentally incompetent requires the reconciliation of two conflicting policies: the protection of justifiable expectations and of the security of transactions, and the protection of persons unable to protect themselves against imposition. Each policy has sometimes prevailed to a greater extent than is stated in this Section. At one extreme, it has been said that a lunatic has no capacity to contract because he has no mind; this view has given way to a better understanding of mental phenomena and to the doctrine that contractual obligation depends on manifestation of assent rather than on mental assent. See §§2, 19. At the other extreme, it has been asserted that mental incompetency has no effect on a contract unless other grounds of avoidance are present, such as fraud, undue influence, on gross inadequacy of consideration; it is now widely believed that such a rule gives inadequate protection to the incompetent and his

family, particularly where the contract is entirely executory.

b. *The standard of competency.* It is now recognized that there is a wide variety of types and degrees of mental incompetency. Among them are congenital deficiencies in intelligence, the mental deterioration of old age, the effects of brain damage caused by accident or organic disease, and mental illnesses evidenced by such symptoms as delusions, hallucinations, delirium, confusion and depression. Where no guardian has been appointed, there is full contractual capacity in any case unless the mental illness or defect has affected the particular transaction: a person may be able to understand almost nothing, or only simple or routine transactions, or he may be incompetent only with respect to a particular type of transaction. Even though understanding is complete, he may lack the ability to control his acts in the way that the normal individual can and does control them; in such cases the inability makes the contract voidable only if the other party has reason to know of his condition. Where a person has some understanding of a particular transaction which is affected by mental illness or defect, the controlling consideration is whether the transaction. in its result is one which a reasonably competent person might have made.

Illustration:

1. A, a school teacher, is a member of a retirement plan and has elected a lower monthly benefit in order to provide a benefit to her husband if she dies first. At age 60 she suffers a "nervous breakdown," takes a leave of absence, and is treated for cerebral arteriosclerosis.

When the leave expires she applies for retirement, revokes her previous election, and elects a larger annuity with no death benefit. In view of her reduced life expectancy, the change is foolhardy, and there are no other circumstances to explain the change. She fully understands the plan, but by reason of mental illness is unable to make a decision based on the prospect of her dying before her husband. The officers of the plan have reason to know of her condition. Two months after the changed election she dies. The change of election is voidable.

c. *Proof of incompetency.* Where there has been no previous adjudication of incompetency, the burden of proof is on the party asserting incompetency. Proof of irrational or unintelligent behavior is essential; almost any conduct of the person may be relevant, as may lay and expert opinions and prior and subsequent adjudications of incompetency. Age, bodily infirmity or disease, use of alcohol or drugs, and illiteracy may bolster other evidence of incompetency. Other facts have significance when there is mental illness or defect but some understanding: absence of independent advice, confidential or fiduciary relationship, undue influence, fraud, or secrecy; in such cases the critical fact often is departure from the normal pattern of similar transactions, and particularly inadequacy of consideration.

We believe the illustration and the above comment is on all fours with the present case. The tragic history of the decedent's last year is a story of "delusion, hallucination, delirium, confusion and depression". We believe that the evidence of the incompetence of the decedent and his inability to make a rational de-

cision in the last several months of his life is clear.[3] The failure of the board to find the decedent incompetent is, in our view, a capricious disregard of this evidence. We adopt the statement of the law as set forth in Restatement of the Law of Contracts Second and find it especially applicable to this case.

Appellant has requested relief in the alternative: (1) that the pension contract should be amended to permit the selection of options 1 of 4 and the beneficiary changed to the decedent's daughter, Loretta, or (2) the pension contract should be voided and the decedent's pension should be resolved as if he did not have the opportunity to select any option before his death. Since we have determined that the contract is void, we cannot reform it and, therefore, we are empowered to grant only the second request of the appellant.

Accordingly, the decision of the Board of March 24, 1982, is reversed and judgment in the amount of $154,311.45 with interest is awarded to petitioner, the Estate of Francis J. McGovern.

Judge WILLIAMS, JR. concurs in the result only.

ORDER

Now, September 5, 1984 the order of the Commonwealth of Pennsylvania, State Employes' Retirement Board, entered March 24, 1982, is reversed and judgment in the amount of $154,311.45, with interest at the legal rate from the date of the Board's decision on March 24, 1982, is awarded to the Estate of Francis J. McGovern, petitioner.

[3] This conclusion is buttressed by a letter dated November 23, 1981, from Herbert B. Frank, D.O., the decedent's family physician, accepted by the Board as Petitioner's Exhibit H (R. 218a) which states in part:

In November and December of 1980 and January of 1981, I learned that Mr. McGovern's faculties had been seriously impaired by his consumption of alcohol and the inevitability of his wife's condition.